WILL TILLMAN, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

## Opinion Filed April 18, 1921.

1. Where a homicide is committed with a design to effect death by an unlawful act, it is not murder in the third degree, because to constitute that offense the killing must be perpetrated *without* any design to effect death.

2. There is no such offence as an assault with intent to commit murder in the third degree, because the presence of an *intent* precludes the commission of that offence.

3. An officer without a search warrant, or warrant of arrest, has no right to stop anyone on the public highway, particularly in the night time, and demand that he surrender what he has in his possession, or take it from him without his consent.

4. The oath of an officer to support, protect and defend the Constitution precludes his seizing property in violation of any provision of the Constitution that "The right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches, shall not be violated, and no warrants issued but upon probable cause, supported by oath, or affirmation, particularly describing the place or places to be searched, and the person or persons, and thing or things to be seized."

A Writ of Error to the Circuit Court for Manatee County; O. K. Reaves, Judge.

Judgment reversed.

*E. Bradley,* for Plaintiff in Error;

*Rivers H. Buford,* Attorney General, and *J. B. Gaines,* Assistant, for the State.

BROWNE, C. J.—Will Tillman was tried in the Circuit Court of Manatee County on an indictment charging that he "unlawfully, feloniously, and from a premeditated design to effect the death" of C. D. Blackwelder, an assault did make, etc., "with intent the said C. D. Blackwelder then and there to kill and murder." He was convicted of "assault with intent to commit murder in the third degree."

It is contended by the defendant in error that the verdict is illegal in that it finds the defendant guilty of an offense that does not exist. Murder in the third degree is defined by the statute to be "the unlawful killing of a human being  *  *  *  when perpetrated without any design to effect death, by a person engaged in the commission of any felony, other than arson, rape, robbery or burglary."

To constitute the offense of murder in the third degree, the assault must be made "without any design to effect death." If the design to effect death by the unlawful act exists, it cannot be murder in the third degree, because to constitute that offense the killing must be perpetrated *without* any design to effect death. There can, therefore, be no such offense as an assault with intent to commit murder in the third degree, because the presence of an *intent* precludes the commission of that offense.

But in Grace v. State, 78 Fla. 486, 83 South. Rep. 271, this court sustained a conviction of assault with intent to commit murder in the third degree on the ground that the facts afforded a legal basis for finding the defendant

guilty of the higher offense of murder in the second degree.

The authority for this decision is placed on Section 6110 of the Revised General Statutes of 1921, which provides, "in all criminal prosecutions hereafter begun in this State, if the defendant be found guilty of an offense lesser in degree, but included within the offense charged in the indictment or information, such verdict shall not be set aside by the court upon the ground that such verdict is contrary to the evidence, if the evidence produced in such case would have supported a finding, or if such court would have sustained a verdict of guilty of the greater offense."

Under this statute it has been held—Grace v. State, *supra*, that if the testimony will sustain a conviction of assault with intent to commit murder in the first or second degree, a verdict of assault with intent to commit murder in the third degree will not be set aside.

The testimony in this case, however, would not sustain a verdict of murder in the first or second degree, and the statute, therefore, does not apply.

The only testimony to show how the shooting occurred is that of Blackwelder, the deputy sheriff; the defendant having denied the shooting and claimed to have been at his home at the time the affray is said to have taken place.

The material part of the testimony of the deputy sheriff is substantially as follows: That while proceeding in his car along the road he met "a negro walking with something under his arm, and when I overtook him I stopped in the road and he turned out on the lefthand side of my car, and he stopped, and I spoke to him

and asked him what it was he had under his arm, and he said something, I couldn't understand what he said, and I got out of my car and walked around to where he was, and I saw who he was. It was Will Tillman. I went and—and when I got to him I reached under his arm and asked him to let me see what he had, and he threw his pistol on me and said, now, you damned son-of-bitch, you have been getting it from some of them, but you will never get it from me. And I didn't have my pistol out, but I grabbed his, and he shot at me and shot through the brim of my hat, and blinded me so I couldn't see anything for a little while, and by the time I got straight and got my pistol he was already—I should say—thirty yards from me, running, and I shot at him five times. * * * My lights were burning when I met him, and the lights continued to burn and my engine was running all during the time of the altercation, or scuffle, with the defendant.

"The package that he had wasn't wrapped up at all. Was not packed, not anything. It looked like a gallon jug or a can. End of a can. I don't know whether it was a gallon of syrup or a gallon of moonshine. I didn't take it away from him. * * * I had hold of the barrel of the pistol when it went off. He must have pulled the trigger. I didn't. I couldn't tell you whether he pulled the trigger or whether it just went off. The second time the pistol went off he had jerked it loose from me. I didn't have hold of it at all. * * * The scuffle occurred practically beside the front door of the car. About six feet further. When I got around the car to where Tillman was standing he was still standing there. He didn't have time to walk off. He didn't attempt to walk off. When I got around there to where he was I don't know whether he knew who I was or not.

"It was about a second or so after the first shot before he shot me again. When he jerked the pistol loose from me and jerked it out of my hand he fired again, and it went through the rim of my hat. We were both standing up. When it went off the second time I was still right at him. I grabbed hold of his arm when he jerked the pistol loose from me. I still held to his package. He ran off with it. When I seen him he had it."

We note these discrepancies in his testimony.

On direct examination he testified to only one shot being fired, but on cross-examination he says that two shots were fired within "a second or so of each other."

In one part of his testimony he says that he "never got hold of the package that Tillman had under his arm," but on cross-examination he says, "I still held to his package. He ran off with it. When I seen him he had it." In his direct examination he says, "When I got to him I reached under his arm and asked him to let me see what he had." Also, "I reached to see what he had under his arm, to take it out from under his arm." "I had a right to take it out from under his arm." "I had hold of him."

His testimony is also at variance in the matter of the defendant knowing he was an officer. In his direct examination in response to the question: "Did he know you, and know that you were a deputy sheriff?" He said, "Yes sir, he did." But on cross-examination he testified, "when I got around there to where he was I don't know whether he knew who I was or not."

The case presented by this testimony is that a deputy sheriff, while proceeding at night in his car along the public road met a negro man walking with something

under his arm; he stopped his car in the road, and when he did so the negro also stopped and the deputy sheriff seeing he had a package under his arm jumped out of the car and without a warrant and without knowing what the package contained, and without disclosing his official character, attempted to take the package from him. The man resisted the attempt to take his property, and drew his pistol and Blackwelder grabbed it. A scuffle ensued, and the pistol was discharged twice within "a second or so"; one of the shots passing through the deputy's hat.

Under this testimony a conviction of assault with intent to commit murder in the first or second degree could not have been sustained, and the offense, therefore, does not come within the statute.

This brings us to the proposition, has an officer without a search warrant, or warrant of arrest, the right to stop anyone on the public highway, particularly in the night time, and demand that he surrender what he has in his possession, or take it from him without his consent?

Section 22 of the Declaration of Rights of the Constitution of Florida, ordains, "The right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches, shall not be violated, and no warrants issued but upon probable cause, supported by oath, or affirmation, particularly describing the place or places to be searched, and the person or persons, and thing or things to be seized."

It is true that in this instance the person who was to be searched, and whose effects the officer attempted to seize without a warrant, belongs to a race who some seem to think have no rights that a white man is bound to respect.

Such a doctrine has never been sanctioned by this court, or any of the courts of this country.

The guarantees of the Constitution protect all classes and races alike. It is but a step, and a short one, from violating the rights of negroes to violating the rights of white persons, "to be secure in their persons, homes, papers and effects against unreasonable seizure and searches without warrants issued but upon probable cause, supported by oath or affirmation, particularly describing the place or places to be searched, and the person or persons, and thing or things to be seized."

However zealous an officer may be in the performance of his duties, he should not forget that his oath to "support, protect, and defend the Constitution" precludes his seizing property in violation of the Constitution.

Eliminate the question of race or color, and the case presented is that of a person walking on a public highway at night and is accosted by another, who assaults him and seeks to take from him by force, without warrant, property in his possession. The assaulted person resists, and in the scuffle shots are fired at the assailant. This would not be an assault to commit murder in either the first or the second degree.

The offense not coming within the statute, and there being no such offense as assault with intent to murder in the third degree—that is, an assault with *intent* to commit an act *without intent*—the judgment must be and it is reversed.

TAYLOR, WHITFIELD AND ELLIS, J. J., concur.

WEST, J., concurs in conclusion.