## McNEAL v. CULVER, STATE PRISON CUSTODIAN.

No. 52. Argued December 6, 1960.—Decided January 23, 1961.

*Sam Daniels,* acting under appointment by the Court, 362 U. S . 946, argued the cause and filed a brief for petitioner.

*Odis M. Henderson,* Assistant Attorney General of Florida, argued the cause for respondent. With him on the brief was *Richard W. Ervin,* Attorney General.

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

Upon an information charging "Assault to Murder in the First Degree," petitioner was put to trial, without counsel, before a jury in a Florida court, was convicted of "Assault to Murder in the Second Degree" and sentenced to imprisonment for a term of 20 years which he is now serving. No appeal was taken, but within a year from his conviction petitioner filed a petition for a writ of habeas corpus in the Supreme Court of Florida.

In that rather inartfully drawn petition, prepared in the penitentiary, at least the following allegations were made with reasonable clarity: When brought before the court for trial, petitioner, an indigent, ignorant and mentally ill Negro then 29 years of age, advised the court that he was without, and unable to obtain, counsel to conduct his defense and asked that counsel be appointed to represent him. The judge declined to do so, saying (1) "[S]ince this is not a capital offence you are not entitled to a court appointed attorney," and (2) "you won't need a Lawyer in this case." Immediately, a jury was impaneled, the trial began, and petitioner was left to conduct his own defense. But, having "never before appeared in any court on a felony, and . . . not understand[ing] court procedure or know[ing] how to defend himself," petitioner was unable effectively to conduct and present his defense, and, in consequence, the court's denial of his request for counsel deprived him of due process of law guaranteed by both the Florida and the United States Constitutions.

The Florida Supreme Court issued a provisional writ of habeas corpus directing respondent to make a proper return. Respondent's return denied that "petitioner's constitutional rights were violated by the court's alleged refusal to appoint counsel in his behalf," attached a copy of (1) a partial transcript of proceedings at the trial,

(2) the judgment of conviction and sentence, and (3) the commitment, and asserted that petitioner was being lawfully imprisoned under the latter document. Finding nothing "in this record of the trial to show whether or not any request was made of the trial judge to appoint counsel to aid the petitioner in his defense," and believing "that the issues were [not] so complex, or [that] the petitioner was [not] so young, ignorant and inexperienced, as to bring into play the exception to the rule requiring appointment of counsel only in capital cases and to require further inquiry into the procedure culminating in his conviction and sentence," the Florida Supreme Court, without any hearing upon petitioner's allegations, discharged the writ and remanded petitioner to custody. 113 So. 2d 381. We granted certiorari to determine whether the allegations in the habeas corpus petition, as supplemented by other portions of the record, are such as entitled him to a full hearing thereon, and, if so and if those allegations be found true, whether petitioner was denied due process of law guaranteed by the Fourteenth Amendment of the United States Constitution. 362 U. S. 910.

It is thoroughly settled that:

> " 'Where the gravity of the crime and other factors—such as the age and education of the defendant, the conduct of the court or the prosecuting officials, and the complicated nature of the offense charged and the possible defenses thereto—render criminal proceedings without counsel so apt to result in injustice as to be fundamentally unfair,' the Constitution requires that the accused must have legal assistance at his trial." *Cash* v. *Culver,* 358 U. S. 633, 637, and cases cited.[1]

---

[1] Such is the rule, in those circumstances, whether or not the accused requested the appointment of counsel. *Uveges* v. *Pennsylvania,* 335 U. S. 437, 441.

The record shows that petitioner was involved in a minor altercation with the proprietors—two men named Scurry—of what is referred to as a "jook," called the "Blue Chip," located in the "colored quarters" of Lake Wales, Florida, during the evening of December 10, 1957, and was ordered to leave the place, which he did. Soon afterward, petitioner, "without shirt or shoes" and armed with a shotgun, approached the "Blue Chip" and, although a number of persons, including one of the Scurrys, were standing on the sidewalk, petitioner fired the gun in their direction. Some of the pellets struck the lower legs of four persons, but Scurry was not hit. City police officers immediately arrested petitioner. They stated that, in the course of transporting him to jail, petitioner said that "he was sorry he shot these other boys, he intended to kill Scurry." On this premise, petitioner was charged with and tried for "Assault to Murder in the First Degree."

Although the record does not disclose the extent of petitioner's education, there is abundant evidence that it was slight.[2] Moreover, the record shows that he suffered head injuries in the Army in 1952, and ever since has been subject to "blackout spells" when excited. For a period of months following April 8, 1956, he underwent treatment for his mental condition in the Veterans Hospital at Bay Pines, Florida, and during four months of that period he was detained in the psychopathic ward. In October 1956, he was released, apparently to his mother as his guardian,[3] but he continued to return to the hospital to "get pills."

---

[2] The following statements, made by petitioner at his trial, are clear evidence of his lack of education: "when I gets excited, I blacks out"; "I had it because I throwed it down myself"; ". . . without no shirt and no shoes"; "I goes and gets pills."

[3] On this score petitioner testified:

"When I was in the hospital, I stayed over there four months locked in the ward, psycho part of it; and the four months I was

The record shows that petitioner was incapable of questioning witnesses and otherwise unable to conduct his defense. The State produced four witnesses—the complaining witness, Ellix Scurry, and three police officers. Petitioner asked two questions of the witness Scurry and obtained answers thereto. His third "question" was precluded by the judge, although not objected to by the State, because "that is testifying and it isn't time for you to testify." Petitioner asked no further questions of Scurry, did not cross-examine the other three witnesses, nor did he make a single objection during the trial. When the State rested, the judge said to petitioner: "All right, now, Elijah, that is the State's case. If you want to, you can take the stand and tell your side of it. If you don't want to, you don't have to . . . ." Petitioner then took the stand and, after mentioning his head injury, "blackout spells" and hospital treatment for his mental illness, testified that he must have suffered a "blackout spell" preceding and during the shooting incident as "that part is a complete blank," but that he is sure he did not "intend to kill anybody." He then attempted to put in evidence a doctor's statement which he said verified his claim of suffering "blackout spells." Although the State did not object, the judge said "This statement would not be admissible. You could put the doctor on and have him testify; but we cannot admit any statement like this," and the statement was not received in evidence. At the conclusion of petitioner's testimony, the judge said to petitioner: "Now, Lige, if you had an attorney, he would

over there, I had to stay in there locked up all the time. Mama was the only one that could come and see me. And, well, about the latter part of the four months he give me a weekend pass. He was trying me to see if I would come back.

"And I went home and I come back on time. And I asked mama to come and sign for me as that was the only way I could get back. I had to have a guardian to sign. And she come over there that day and begged the doctor to let me go home."

argue the case before the jury" and advised petitioner that, if he desired, he could "plead [his] case." Petitioner replied: "Well, sir, I don't quite understand the meaning of that," and he did not make any argument to the jury.

These facts tend strongly to show that petitioner's ignorance, coupled with his mental illness and complete unfamiliarity with the law and court procedures, and the scant, if any, help he received from the court, made the trial fundamentally unfair.

In addition to this showing of petitioner's lack of education and mental illness and his consequent inability to defend himself, the record at least implicitly discloses a number of highly complex legal questions, beyond the comprehension of almost any layman.

The Florida assault law appears to be replete with distinctions and degrees. Mayhem, bare assault, assault and battery, aggravated assault and assault *with intent* to commit felony are all statutory offenses.[4] Assault *with intent* to commit felony—apparently the crime intended to be charged against petitioner—incorporates by reference all Florida felonies and the degrees thereof.[5] The Florida homicide statutes appear to create four separate offenses—manslaughter,[6] and murder in the first, second and third degrees.[7] In considering the interplay between homicide and assault with intent to commit felony, the

---

[4] 2 Fla. Stat. 1957, p. 2800, §§ 784.01–784.06.

[5] 2 Fla. Stat. 1957, p. 2800, § 784.06, which provides:

"ASSAULT WITH INTENT TO COMMIT FELONY.—Whoever commits an assault on another, with intent to commit any felony punishable with death or imprisonment for life, shall be punished by imprisonment in the state prison not exceeding twenty years. An assault with intent to commit any other felony shall be punished to an extent not exceeding one-half the punishment which could have been inflicted had the crime been committed."

[6] 2 Fla. Stat. 1957, p. 2798, § 782.07.

[7] 2 Fla. Stat. 1957, p. 2797, § 782.04.

Florida courts have held that, although one may be guilty of assault with intent to commit manslaughter, *Lassiter* v. *State*, 98 Fla. 370, 123 So. 735, there is no such thing as assault with intent to commit murder in the second or third degree because—inasmuch as those crimes do not require a finding of "intent"—such would be "an assault with *intent* to commit an act *without intent.*" *Tillman* v. *State*, 81 Fla. 558, 564, 88 So. 377, 380.

To establish the requisite "intent" to commit any of the grades or degrees of unlawful homicide "it will not be sufficient to show that the killing, had it occurred, would have been unlawful and a felony, but it must be found that the accused committed the assault with intent to take life, for although an unintentional or involuntary killing may in some cases be unlawful and a felony, no man can intentionally do an unintentional act; and without the intent the assault can not be punished under this statute, even though the killing, had it been committed, would have amounted to a felony. . . ." *Williams* v. *State*, 41 Fla. 295, 298, 26 So. 184, 185.

If, in firing the gun, petitioner did not have this felonious "intent to kill," his greatest possible crime would have been "Aggravated Assault"—an assault "with a deadly weapon, without intent to kill." [8]  This is not an academic distinction, for 15 years' difference in punishment is involved.[9]  The only testimony in this record of "intent to kill" was that of the police officers who testified that while transporting him to jail on the night of the occurrence, petitioner stated that he "intended to kill Scurry." That testimony appears to have been admitted without the slightest inquiry as to whether the statement was freely and voluntarily made by peti-

---

[8] 2 Fla. Stat. 1957, p. 2800, § 784.04.

[9] Five years is the maximum sentence for aggravated assault under § 784.04, whereas a 20-year sentence may be imposed for assault with intent to commit felony under § 784.06.

tioner. Admission of that crucial evidence, in those circumstances, shows a patent violation of the Florida law which renders inadmissible all admissions made to law officers by an accused while under arrest unless the State *affirmatively shows* that they were freely and voluntarily made. *Louette* v. *State,* 152 Fla. 495, 12 So. 2d 168; *Thomas* v. *State* (Fla. 1957), 92 So. 2d 621; *Williams* v. *State* (Fla. 1954), 74 So. 2d 797. These complex and intricate legal questions were obviously "beyond the ken of a layman." *Cash* v. *Culver, supra,* at 638.

Indeed, it is questionable whether such a crime as the one upon which petitioner was charged, tried and convicted—"Assault to Murder," not "Assault *with Intent* to Commit Felony"—actually exists under the Florida law, *Williams* v. *State, supra,* and it is equally uncertain whether the verdict, convicting petitioner of "Assault to Murder in the Second Degree," is sufficient to support the judgment in the light of 2 Fla. Stat. 1957, p. 2957, § 921.03, which contains the provision that "no judgment of guilty shall be rendered on a verdict unless the jurors clearly express in it a finding against the defendant upon the issue." See also *French* v. *State,* 96 Fla. 657, 118 So. 815.

Moreover, the record contains facts which would have instantly suggested to counsel that petitioner might have a good insanity defense. "[W]hen there is testimony of insanity sufficient to present a reasonable doubt of sanity the presumption [of sanity] vanishes. The defendant is then entitled to an acquittal if the state does not overcome the reasonable doubt." *Farrell* v. *State* (Fla. 1958), 101 So. 2d 130, 133. It is too much to expect this mentally ill petitioner effectively to raise and establish the defense of his own insanity, and, so far as this record shows, neither the prosecutor nor the trial court took any notice of the matter.

The question treated in the separate concurring opinion only lurks in the record, as it was not raised, briefed or argued here, and therefore we do not reach or express any views upon it.

For the totality of the reasons reviewed, due process of law required that petitioner have the assistance of counsel at the trial of this case, if the facts and circumstances alleged in his habeas corpus petition are true. On the present record it is not possible to determine their truth. But the allegations themselves made it incumbent on the Florida court to grant petitioner a hearing and to determine what the true facts are.

*Reversed.*

Mr. Justice Douglas, whom Mr. Justice Brennan joins, concurring.

While I join the opinion of the Court, I rest also on another ground for reversal.

Nearly 19 years ago the Court held in *Betts* v. *Brady,* 316 U. S. 455, that a state court in a criminal case need not appoint counsel to represent an indigent defendant, unless the failure to furnish counsel results in a conviction lacking in "fundamental fairness." *Id.,* 473. That decision was by a divided Court; and six Justices now sit on the Court who had no hand in fashioning the rule.

I cannot believe that a majority of the present Court would agree to *Betts* v. *Brady* were it here *de novo,* especially in light of our unanimous decision in *Chandler* v. *Fretag,* 348 U. S. 3, 9, where we held that the right of a defendant in a state criminal trial "to be heard through his own counsel" is "unqualified." In that case an accused requested a continuance so that he could obtain a lawyer. We held it was reversible error for a state court to deny the request and to put the defendant to trial without counsel. We said that right to counsel

118

turned, not on the nature of the crime charged, but on the importance of the presence of counsel to an accused's right to a hearing. We relied on *Powell* v. *Alabama,* 287 U. S. 45, 68–69:

"The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him." [1]

The result of our decisions is to refuse a State the power to force a person into a criminal trial without a lawyer if he wants one and can afford to hire one, but to deny the same protection to an accused who is too poor to retain counsel. This draws a line between rich and poor that is repugnant to due process. The need of counsel is the same, whatever the economic status of the accused. If due process requires that a rich man who wants a lawyer be allowed the opportunity to obtain one before he is tried, why should not due process give the same protection to the accused who is indigent? Even penniless vagrants [2] are at times caught in a tangle of laws that only an astute lawyer can resolve, as our own decisions show. *Edwards* v. *California,* 314 U. S. 160; *Edelman* v. *California,* 344 U. S. 357; *Thompson* v. *Louisville,* 362 U. S. 199.

---

[1] For a scholarly account of an attempt in a contemporary society to abolish procedural safeguards and provide "simple" judicial systems see Hazard, Settling Disputes in Soviet Society (1960).

[2] The manner of administration of vagrancy laws and their harshness, due in part to the denial to the drifters in our midst of the procedural protections which others obtain, is vividly shown in Foote, Vagrancy-Type Law and Its Administration, 104 U. of Pa. L. Rev. 603.

*Betts* v. *Brady* requires the indigent, when convicted in a trial where he has no counsel, to show that there was fundamental unfairness. We have set aside a number of convictions so obtained, as our recent decision in *Cash* v. *Culver*, 358 U. S. 633, 636, n. 6, shows. Yet this is a heavy burden to carry, especially for an accused who has no lawyer and who cannot afford to hire one. It is a burden placed on an accused solely by reason of his poverty. Its only sanction is *Betts* v. *Brady* which is so at war with our concept of equal justice under law that it should be overruled.[3] Are we to wait to overrule it until a case arises where the indigent is unable to make a convincing demonstration that the absence of counsel prejudiced him?

## APPENDIX TO OPINION OF MR. JUSTICE DOUGLAS.

In 1942, MR. JUSTICE BLACK appended to his dissenting opinion in *Betts* v. *Brady*, 316 U. S. 455, 477, a compilation of the laws of the States regarding the right to appointment of counsel. This Appendix brings the classification down to date. Thirty-five States provide for appointment of counsel as of course on behalf of an indigent in any felony case; 15 States either make no

---

[3] In *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, Mr. Justice Brandeis, writing for the Court, overruled *Swift* v. *Tyson*, 16 Pet. 1. Mr. Justice Butler, speaking for himself and Mr. Justice McReynolds, strenuously objected, pointing out that the question had never been raised or argued, 304 U. S., at 82, 87, and asking that, before *Swift* v. *Tyson* was overruled, the case be put down for reargument. "It may not justly be assumed that the labor and argument of counsel for the parties would not disclose the right conclusion and aid the Court in the statement of reasons to support it." 304 U. S., at 88. But the problems created under the regime of *Swift* v. *Tyson* were as abundantly clear to the Court from its screening of hundreds of cases as are those which *Betts* v. *Brady* has spawned.

explicit provision for appointment of counsel or make provision therefor only in capital cases or leave appointment of counsel to the discretion of the trial judge.

A. *Appointment of counsel for indigents in all felony cases, as of course, by force of the State Constitution, statutes, court rule, or judicial decision.*

Alaska: Rules of Criminal Procedure, Rule 39 (b).

Arizona: Rules of Criminal Procedure, Rule 163.

Arkansas: Ark. Stat. § 43–1203.

California: Calif. Penal Code § 987.

Connecticut: Gen. Stat. of Conn. (1958 Rev.) § 54–80. See *State* v. *Reid,* 146 Conn. 227, 149 A. 2d 698.

Georgia: Ga. Const., Art. I, § I, Par. V (Ga. Code Ann. § 2–105). See *Bibb County* v. *Hancock,* 211 Ga. 429, 86 S. E. 2d 511.

Idaho: Idaho Code Ann. §§ 19–1512, 19–1513.

Illinois: Ill. Supreme Court Rules, Rule 26 (2), Ill. Rev. Stat. (1959), c. 110, § 101.26 (2).

Indiana: Ind. Const., Art. I, § 13. See *State ex rel. Grecco* v. *Allen Circuit Court,* 238 Ind. 571, 153 N. E. 2d 914.

Iowa: Iowa Code Ann. § 775.4.

Kansas: Gen. Stat. of Kansas (1959 Supp.) § 62–1304.

Kentucky: Ky. Const., § 11. See *Calhoun* v. *Commonwealth,* 301 Ky. 789, 193 S. W. 2d 420.

Louisiana: La. Rev. Stat. § 15–143.

Massachusetts: Rule 10, General Rules of the Supreme Judicial Court of Massachusetts, 337 Mass. 813; Ann. Laws of Mass., c. 277, § 47.

Minnesota: Minn. Stat., 1957, § 611.07, as amended by Minn. Laws 1959, c. 383.

Missouri: Mo. Rev. Stat., 1949, § 545.820.

Montana: Rev. Code of Montana § 94–6512.

Nebraska: Rev. Stat. of Nebraska (1943) § 29–1803, as amended by Laws 1957, c. 104, § 1, c. 107, § 6.

Nevada: Nev. Rev. Stat. § 174.120.

New Jersey: N. J. Const., Art. I, ¶ 10; Rev. Rules, § 1:12–9.

New Mexico: N. M. Stat. Ann. (1953 Comp.) § 41–11–2. Cf. Const., Art. II, § 14; see *State* v. *Garcia,* 47 N. M. 319, 142 P. 2d 552.

New York: N. Y. Code of Criminal Procedure § 308.

North Dakota: N. D. Century Code § 29–01–27.

Ohio: Ohio Rev. Code § 2941.50.

Oklahoma: 22 Okla. Stat. § 464.

Oregon: Ore. Rev. Stat. § 135.320.

South Dakota: S. D. Code § 34.3506; S. D. Code (1960 Supp.) § 34.1901.

Tennessee: Tenn. Code §§ 40–2002, 40–2003.

Texas: Vernon's Texas Code of Criminal Procedure § 494, as amended by Acts 1959, 56th Leg., p. 1061, c. 484, § 1.

Utah: Utah Code Ann. § 77–22–12.

Virginia: Code of Va. § 19.1–241.

Washington: Rev. Code of Wash. § 10.01.110.

West Virginia: Rules of Practice for Trial Courts, Rule IV.

Wisconsin: *Carpenter* v. *Dane County,* 9 Wis. 274. See Wis. Stat. Ann. § 957.26.

Wyoming: Wyo. Stat. § 7–7.

B. *States not making provision for appointment of counsel for indigents in all felony cases.*

Alabama: Code of Ala., Tit. 15, § 318 (capital cases). See *Gilchrist* v. *State,* 234 Ala. 73, 173 So. 651.

Colorado: Colo. Rev. Stat. § 39–7–29. See *Kelley* v. *People,* 120 Colo. 1, 206 P. 2d 337.

Delaware: Superior Court Rules—Criminal Rule 44 (capital cases and "any other case in which the court deems it appropriate").

Florida: Fla. Stat. § 909.21 (capital cases). See *Watson* v. *State,* 142 Fla. 218, 194 So. 640.

Hawaii: Rev. Laws of Hawaii (1955) § 253–5, as amended by Laws 1957, Act 239 (in force after statehood, see Const., Art. XVI, § 2).

Maine: Me. Rev. Stat., c. 148, § 11 (capital cases and where sentence of life imprisonment may be imposed, otherwise permissive).

Maryland: Md. Rules of Procedure, Criminal Causes, Rule 723, § b (in all capital cases and other "serious cases").

Michigan: Mich. Comp. Laws, 1948, § 775.16, as amended by Public Acts 1957, No. 256. See *People* v. *Williams,* 225 Mich. 133, 195 N. W. 818.

Mississippi: Miss. Code Ann. (rec. 1956) § 2505 ("capital crime").

New Hampshire: N. H. Rev. Stat. §§ 604:1, 604:2 (capital crimes or other cases where "injustice may be done if provision is not made therefor").

North Carolina: N. C. Gen. Stat. § 15–4.1. See *State* v. *Davis,* 248 N. C. 318, 103 S. E. 2d 289.

Pennsylvania: Purdon's Pa. Stat., Tit. 19, §§ 783, 784 (capital cases).

Rhode Island: Gen. Laws of Rhode Island § 12–15–3. See *State* v. *Hudson,* 55 R. I. 141, 179 A. 130; *Lee* v. *Kindelan,* 80 R. I. 212, 95 A. 2d 51.

South Carolina: S. C. Code of Laws § 17–507 (capital cases). See *State* v. *Hollman,* 232 S. C. 489, 102 S. E. 2d 873.

Vermont: 13 Vt. Stat. Ann. § 6503. See *State* v. *Gomez,* 89 Vt. 490, 96 A. 190.