POLLAK, In re.

Common Pleas Court, Paulding County.

No. 18875. Decided March 6, 1962.

114

*Mr. Harvey E. Hyman,* for appellant.

*Mr. Mark McElroy,* attorney general, and *Mr. Vatro J. Grill,* assistant attorney general, for the respondent.

HITCHCOCK, J. In this appeal from an order of the Ohio State Board of Pharmacy this court this day made a finding, in pertinent part, reading as follows:

''* * *

"7. b. That on hearing of this appeal on September 22, 1961, evidence aliunde the record was received bearing on the issue raised by appellant to the effect that he was not accorded 'due course of law' or 'due process of law' in the proceedings leading to his plea of 'guilty' in said criminal cause No. 2700 aforementioned.

"8. That from the evidence and from the Court's definite recollection of the conduct of the prosecuting officials at the trial, it was clearly established that the order finding appellant guilty of a felony was probably entered under circumstances which did not accord appellant as defendant 'due course of law' under Sec. 16, Art. I, Ohio Constitution.

"9. a. That since the hearing of this appeal, appellant by petition filed in said cause No. 2700 prayed that the order and judgment entered therein against him on April 14, 1961, be vacated, set aside and held for naught for stated reasons and that he be permitted to withdraw his waiver of grand jury and acceptance of the information filed in said case against him. That said petition (filed as a motion, but by amendment made a petition) after notice to all counsel in interest was heard on February 8, 1962. That after consideration of all available evidence the court found that appellant had not as defendant been accorded 'due course of law' under Sec. 16, Art. I, Ohio Constitution, and that he was entitled to have his sentence in No. 2700 dated April 14, 1961, vacated, set aside and held for naught,

Also that he should have leave to withdrawn his waiver of grand jury, acceptance of information and waiver of jury trial, plea of 'guilty' and have the information submitted to the next term of the grand jury for reasons enunciated in these cases: *Barnhardt* v. *Linzell* (1957), 104 Ohio App., 243, 148 N. E. (2d), 242, 4 Ohio Opinions (2d), 391; MCO 10-23-57. *McNeal, Jr.* v. *Culver* (1961), 365 U. S., 109, 81 S. Ct., 413, 15 Ohio Opinions (2d), 381, 5 L. Ed. (2d), 445.

"* * *

"10. That the order of the State Board of Pharmacy dated May 29, 1961, revoking appellant's registration as a pharmicist in this state is unlawful, being based upon a judgment of conviction and sentence voidable for infirmity under the provisions of Sec. 16, Art. I, Ohio Constitution, which judgment has been vacated, set aside and held for naught and appellant is entitled to an order reversing the order of the Ohio State Board of Pharmacy appealed from."

"* * * *"

At the hearing on this appeal on September 22, 1961, the Attorney General contended that the fact that appellant's registration was revoked because he stood convicted of a felony precluded this court from examining into the issue raised by appellant, that he had been denied "due course of law" under Section 16, Article I, Ohio Constitution or "due process of law" under Amendment XIV, Constitution of the United States, in respect to said conviction of felony.

He contended that this Court had no jurisdiction to insert into the record its own then vivid recollection of the events when appellant as defendant was convicted of a felony after a waiver of grand jury, acceptance of service of information, and plea of guilty upon arraignment.

The Attorney General also strenuously objected to the introduction of any evidence aliunde the record made at the time of the board's hearing leading to the revocation of appellant's registration. The court, however, permitted appellant to introduce evidence and gave the Attorney General similar opportunity but he offered none on the issue as to whether or not appellant as defendant was accorded "due course of law" or "due process" in respect to his felony conviction.

The Court took this action pursuant to its understanding of that portion of Section 119.12, Revised Code (in effect since November 4, 1959) reading:

"... The hearing in the court of common pleas shall proceed as in the trial of a civil action, and the court shall determine the rights of the parties in accordance with the laws applicable to such action. At such hearing counsel may be heard on oral argument, briefs may be submitted, and evidence introduced if the court has granted a request for the presentation of additional evidence. ..."

Because the Court had been unable to discover any administrative appeal where the precise question presented here was raised, briefs of counsel were requested from both counsel for the appellant and the Attorney General. Both subsequently submitted briefs but neither brought to light any case affirming the action of an administrative body which was based upon a criminal conviction voidable for want of "due course of law" or "due process" of law.

The Attorney General strenuously objected to the court's recalling and inserting into the record his own recollection of the proceedings and the conduct of the prosecuting officials at the time when appellant plead guilty to a felony. He contended that the Court had no jurisdiction to act in the premises and was bound to take judicial notice of the statutes authorizing revocation of registration as a pharmacist one "... (A) Guilty of a felony or gross immorality; ..." Section 4729.16, Revised Code. That consequently, the Court's question directed to enforcement officers of the State Board of Pharmacy just prior to arraignment, "Will this have any effect upon his license?," was irrelevant and immaterial.

This Court knows it is required to take judicial notice of the statute, which is permissive, not mandatory. The Court asked the question because it wanted to ascertain the policy of the board in the premises. This Court has no intention of depriving any professional man of his livelihood without advice of counsel. It would not have permitted appellant to have entered the plea of "guilty" that he did had it even suspected that proceedings to revoke appellant's registration were to be had as soon as he paid the fines and costs assessed against him. On this same occasion, the prosecuting attorney's almost simul-

taneous reply to the same question was, "I don't know." Just prior to this question the prosecuting attorney had informed the court that defendant-appellant here—was without counsel, and wished to enter a plea of "guilty" and that he specifically was not asking that defendant be sentenced to any imprisonment.

It seems to be the notion of the Attorney General that when the representative of the Ohio State Board of Pharmacy answered aforementioned question with these words, "It is our understanding that this proceeding has nothing to do with his license," he did not lie. Perhaps this is so but this Court holds that in the circumstances it had a double meaning.

The late Mr. Justice Cardozo in "Law and Literature" (Harcourt, Brace & Co., Inc., 1931) at page 20 quotes two famous English judges as follows:

". . . Take this by Lord Blackburn, 'If with intent to lead the plaintiff to act upon it, they put forth a statement which they know may bear two meanings, one of which is false to their knowledge, and thereby the plaintiff, putting that meaning upon it, is misled, I do not think they can escape by saying he out to have put the other. If they palter with him, in a double sense, it may be that they lie like truth, but I think they lie, and it is a fraud.' . . . What a cob-web of fine-spun casuistry is dissipated in a breath by the simple statement of Lord Esher in *Ex parte Simonds*, that the court will not suffer its own officer 'to do a shabby thing' . . ."

This Court concurs in these opinions of Lord Blackburn and Esher as still applicable to both private and public standards of conduct. Also, this Court is of the belief that when any judge asks any pertinent question respecting a pending cause, he is entitled to an unequivocal answer. That an equivocal answer, in such circumstances, fails to accord to the defendant "due course of law" as required by Section 16, Article I, Ohio Constitution; and especially where the defendant is a layman without counsel and the Court is thereby lead to act so as to bring about consequences not then contemplated but which are extremely prejudicial to the defendant.

Moreover, the record contains uncontradicted testimony of the appellant and his wife in respect to the conduct of the enforcement representatives of the State Board of Pharmacy leading to this conviction which fails to meet the standards of

Section 16, Article I, Ohio Constitution; also those of Amendment XIV, Constitution of the United States. The record here reveals this testimony:

Direct examination of appellant by Mr. Hyman:

"* * *

"Q. Now, prior to that time, two investigators were in your store at Payne, were they not?

"A. There was three altogether.

"Q. Three of them.

"A. That's right.

"Q. And do you recall any of their names?

"A. I remember Mr. Pierce and Mr. Turner, and that gentleman's name I can't remember.

"Q. You mean the man sitting behind Mr. Grill?

"A. That is right.

"Q. He was the third one there?

"A. That's right.

"MR. GRILL. If I may, Mr. Lon Ghaster.

"Q. Now, at that time, these people revealed themselves to you as special investigators of the State Pharmacy Board, is that correct?

"A. That's right.

"Q. And did they discuss these charges with you?

"A. Prior to the trial?

"Q. Yes.

"A. Yes, they did.

"Q. In your office, or in your store there in Payne?

"A. That's right, at the prescription room.

"Q. What if anything did they say about the results that would be reached from these charges?

"A. They told me in advance what my charges were and stipulated the fines in each case. They cited four cases.

"Q. And they told you the amount?

"A. Yes.

"Q. And I think it was $500.00 in each case?

"A. In each case.

"Q. Did they say anything about your license and did you say anything to them about your license?

"A. That was a point that troubled me most, for my entire livelihood depended on that and when I was told of the fines

then I immediately asked the two, there was two at the time, and I asked them in regards to my license, and I says, 'The fine is one thing; now, what about my license, will I be able to operate?' and they replied, I can't quote the exact words, but they replied they didn't think so; these fines mentioned would probably be it.

"Q. Was Mr. Ghaster one of those two men?

"A. I believe, and to further that, my wife was standing nearby and she, of course, as spouse, was quite worried about it too, and she heard the statement, but rather than let it go at that, she also asked these gentlemen the same question.

"Q. We got Mrs. Pollak, we will ask her that.

"A. That (indicating) is Mrs. Pollak. She was quite perturbed about it. She asked them the same question. 'How about my husband's license? Would that be taken away?' And they said they didn't think so.

"Q. Did they indicate to you in anyway that if you paid these fines and the costs that that would be the end of it? Did you have the understanding that the fine would constitute it, terminate the matter?

"A. Well, I felt that way, in as much as the fines were assessed and pre-determined and that that would be the end of it, but as I said, I also asked about my license. Well, when they said they didn't think so, I assumed that the fines would be it; that would be final.

"Q. And at that point did they tell you anything about whether or not you needed an attorney?

"A. They did mention the fact that I was, that I could have an attorney if I wanted to, and I forget which one of them I asked this question: I says, 'Do I absolutely have to have an attorney?' and one of them answered, 'Well you can have an attorney if you want to, but this is an open and shut case; it wouldn't do you any good.'

"Q. Subsequent thereto you appeared in this Court, did you not?

"A. Beg pardon?

"Q. Subsequently thereto, you appeared in this Court on your own behalf?

"A. I did, yes.

"Q. And the Court inquired of you if you had an attorney, or wanted one?

"A. He did.

"Q. And I think you replied No.

"A. Right.

"Q. At that time were you still under the assumption that this had nothing to do with the license; that the hearing would not result in any revocation of your license?

"A. That's right, because even after the trial, why about a week later, when I received the letter from the State Board, I was shocked to learn they were asking about my license. Kind of floored me. * * *"

Direct examination of appellant's wife by Mr. Hyman:

"* * *

"Q. You heard Mr. Pollak testify relative to the fact that you were present when certain conversation between the Board investigators and himself occurred?

"A. Yes.

"Q. Were you in fact present at that time?

"A. Yes, I was, all day.

"Q. Did you make any inquiry of these people yourself?

"A. Yes, I did.

"Q. Did you ask them about Mr. Pollak's license to practice pharmacy?

"A. Well, I was concerned about it, and I did.

"Q. What did they reply?

"A. They didn't think so, that—well, they led us to believe that the fine was the limit of—well, I mean, that the fine would take care of all the wrong that had been done.

"Q. Did you hear them telling what the fine would be?

"A. Yes, I did.

"Q. What did they tell?

"A. Five hundred dollars on each account.

"* * *"

The Court is convinced that appellant was induced, by improper promises of the enforcement officials, to make an extraordinarily full and complete disclosure of his affairs and to waive grand jury and to plead guilty to a violation of Section 3719.07 (G) (2), Revised Code, for failing to keep complete

records of his purchases, sales and use of paregoric, a barbiturate compound. Upon the receipt of the waiver of Grand Jury, acceptance of information and plea of guilty the court received testimony of an enforcement official that for the year 1960 defendant's (appellant's) records and inventory of paregoric showed an unexplained shortage of something in excess of one hundred (100) ounces. Before passing of sentence, appellant stated that at least part of this shortage could be explained by the fact that he had used some of this in a medicine he prepared for diarrhea in babies. Considering the whole of the testimony at the trial, and at the hearing on appeal, grave doubt has been raised in the mind of the Court as to the completeness, thoroughness, and accuracy of said inventory examination and determination of shortage.

It is suggested that this Court was without jurisdiction to vacate and set aside the felony conviction in issue here because the application was made after term and as a motion. To the "motion," however, was attached a sworn affidavit and the whole application, having the elements of a petition was amended at the hearing, attended by the prosecuting attorney and counsel for defendant (appellant), and redesignated "petition." Also, the journal entry of vacation of judgment of conviction and sentence was filed on February 26, 1962, and the Prosecuting Attorney has informed this Court that he plans no appeal because he cannot seriously question the facts leading the Court to set aside the judgment and sentence of conviction.

In Ohio it has been determined that "due course of law" in Section 16, Article I, Ohio Constitution, is equivalent to "due process of law" as it appears in Amendment XIV, Constitution of the United States. *Barnhardt* v. *Linzell*, 104 Ohio App., 243, 146 N. E. (2d), 242, 4 Ohio Opinions (2d), 391 (1957), MCO Oct. 23, 1957. And the Supreme Court of the United States just last year in *McNeal* v. *Culver*, 365 U. S., 109, 81 S. Ct., 413, 5 L. Ed. (2d), 445, 15 Ohio Opinions (2d), 381, held "Where the gravity of the crime and other factors such as age and education of the defendant, the conduct of the Court or the Prosecuting officials, and the complicated nature of the offense charged and the possible defenses thereto, render criminal proceedings without counsel so apt to result in injustice as

to be fundamentally unfair, the Constitution requires that the accused must have legal assistance.''

This Court found the criminal action voidable as not according appellant as defendant ''due course of law'' and set the proceedings and waiver of Grand Jury aside, and directed that the information be presented to the next Grand Jury. To the suggestion it had no power to do this it suffices to say that if the Grand Jury returns a ''true bill'' any issue then arising may be fully aired.

Finally it appears to this Court that none of the citations of the Attorney General are applicable to the issues raised here. *Andrews* v. *Board of Liquor Control*, 164 Ohio St., 275, 131 N. E. (2d), 390, 58 Ohio Opinions, 51 (1955); *Will* v. *McCoy*, 135 Ohio St., 241, 20 N. E. (2d), 371, 14 Ohio Opinions, 85 (1939); *Woolworth* v. *Brinker*, 11 Ohio St., 593 (1860); *State Board of Pharmacy* v. *Gafford*, 122 Ohio St., 580, 173 N. E., 192 (1930); *Gawurin* v. *Board of Regents of University of New York*, 48 N. Y. S. (2d), 191, appeal denied 49 N. Y. S. (2d), 481; and *Henry's Cafe, Inc.*, v. *Board of Liquor Control*, 170 Ohio St., 233, 163 N. E. (2d), 678, 10 P. P. (2d), 177 (1959).

In none of them was there personal knowledge of the Court and/or uncontradicted testimony of the appellant indicating that a conviction for a crime upon which subsequent administrative action was based was voidable by reason of the conduct of enforcement agents contrary to constitutional standards of both state and nation.

The vigorous assertions of the Attorney General in this case has lead the Court to an examination of first principles of constitutional construction. *Marbury* v. *Madison*, 5 U. S., 137, 1 Cranch, 137, 2 L. Ed., 60 (1803), dealt with a statutory enactment contrary to the Constitution of the United States. This Court concludes that in this case, dealing with official action pursuant to proper statutory authority but exercised in a manner contrary to a specific section of the Ohio Constitution, these words of Chief Justice Marshall, declared in *Marbury* v. *Madison*, are particularly apt.

''* * * *

''. . . It is emphatically the province and the duty of the judicial department to say what the law is. Those who apply the rule to particular cases must of necessity expound and inter-

pret the rule. If two laws conflict with each other, the courts must decide on the operation of each.

"So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

"If, then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply.

"Those, then, who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.

"This doctrine would subvert the very foundation of all written constitutions. It would declare that an act which, according to the principle and theory of our government, is entirely void, is yet, in practice, completely obligatory. It would declare that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure.

"That it thus reduces to nothing what we have deemed the greater improvement on political institutions, a written constitution, would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction. But the peculiar expressions of the constitution of the United States furnish additional arguments in favour of its rejection. .

"The judicial power of the United States is extended to all cases arising under the constitution. Could it be the intention of those who gave the power, to say that in using it the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises?

"This is too extravagant to be maintained.
"* * *"

In its findings on this appeal this Court went no further than to find the Board's action unlawful because based upon a conviction and sentence voidable for infirmity under the provisions of Sec. 16, Art. I, Ohio Constitution, even though it has no doubt that said conviction and sentence are also voidable for infirmity under the "due process of law" provisions of Amend. XIV, U. S. Constitution. The "due course of law" provisions have been a part of the Ohio Constitution since its first drafting in 1802, more than a half century before the Fourteenth Amendment became effective.