UNITED STATES of America ex rel.
Edward ECKWERTH, Appellant,

v.

Wilfred L. DENNO, Warden of Sing Sing
Prison, Respondent.

No. 170, Docket 25343.

United States Court of Appeals
Second Circuit.

Argued Nov. 7, 1958.

Decided Dec. 2, 1958.

Certiorari Denied Jan. 26, 1959.

See 79 S.Ct. 355.

Barlow Smith, New York City, for appellant.

Warren J. Schneider, Asst. Dist. Atty. of Westchester County, White Plains, N. Y. (Joseph F. Gagliardi, Dist. Atty. of Westchester County, White Plains, N. Y., on the brief), for respondent.

Before CLARK, Chief Judge, WATERMAN, Circuit Judge, and GALSTON, District Judge.

CLARK, Chief Judge.

Edward Eckwerth, the relator, was found guilty of murder in the first degree after a trial to a jury in the Westchester County Court of New York in February 1957; the New York Court of Appeals affirmed without opinion, People v. Eckwerth, 4 N.Y.2d 811, 173 N.Y.S. 2d 614, 149 N.E.2d 894; 4 N.Y.2d 923, 175 N.Y.S.2d 164, 151 N.E.2d 351, and the United States Supreme Court denied certiorari June 30, 1958, Eckwerth v. People of State of New York, 357 U.S. 942, 78 S.Ct. 1396, 2 L.Ed.2d 1557. Judge Murphy below denied relator's petition for a writ of habeas corpus, but granted a certificate of probable cause; and we have stayed Eckwerth's execution which had been set for November 17, 1958. Issue is taken on whether two confessions admitted in evidence were coerced, so that his trial was without constitutional due process.

Viewed in its entirety, the trial in the Westchester County Court appears to have been fairly conducted; and relator was assigned experienced counsel who

gave him excellent and persistent service, as has his present counsel on this appeal. The State's case was that relator killed Rosemarie Spezzo, a 24-year-old Yonkers, New York, parochial school teacher, and concealed her body on June 22, 1956, after having had intercourse with her and upon her threats to tell his wife. Her body remained undiscovered until August 25, 1956, when relator led police to the secluded spot near Yonkers where it was found.

Eckwerth, 28 years old at the date of the crime, is married and the father of a little girl. He lived with his wife and child and was employed as a house-to-house salesman for the Cook Coffee Co. until June 23, 1956—the day after Rosemarie Spezzo disappeared. On the morning of that day Miss Spezzo's father, inquiring after his daughter, who had failed to return home the previous night, recognized Eckwerth as the salesman who made regular deliveries to the Spezzos' home and hailed him. To Mr. Spezzo's questions Eckwerth replied that he had seen Rosemarie the previous afternoon and that she had complained to him of a headache. He stated that he had no idea where she had gone after her brief conversation with him. Although Spezzo did not doubt the truth of relator's statements, he asked the latter for his name and address in order to give the police a complete report of his efforts to find his daughter. The relator gave him a fictitious name and an incorrect telephone number. Then directly after Spezzo drove off, Eckwerth drove to the local railroad station, there abandoned his truck, and, taking his gross sales receipts with him, proceeded by train to New York City and from there by bus across the country to Portland, Oregon. He was ultimately arrested on July 10, 1956, by Portland authorities for the theft of an automobile.

The relator was first questioned about Miss Spezzo's disappearence by Westchester authorities who arrived in Portland on August 21, 1956. They interrogated him for about an hour that evening. He was taken before an Oregon magistrate, where he waived extradition, and the following morning left by plane for New York. In police custody relator arrived at the New York airport about 9:45 p.m. and was immediately taken to the Yonkers Police Station, arriving there around 11:00 p.m. Here he was questioned for a short period by the police captain, and then from 12:30 a.m. to 2:00 a.m. by the District Attorney. Thereafter he was permitted to rest. At 8:45 that morning, August 23, several officers handcuffed relator and took him for a ride in a police car over a portion of his former delivery route. Apparently he was also handcuffed during subsequent trips in the police car. During this first trip he was again questioned about Rosemarie Spezzo's disappearance. At 11:30 a.m. relator was taken before a magistrate in Yonkers where he was notified of his rights and arraigned for passing bad checks and on a charge of grand larceny. He had passed two personal checks on June 22 which were returned for insufficient funds, and in leaving Yonkers on June 23 he had absconded with some of his employer's funds. After the proceedings before the magistrate were concluded—about 12:30 p.m.—relator was taken to the Yonkers Police Station and given lunch. He was then further questioned and driven over portions of his delivery route until 3:45 p.m., when he was returned to the Yonkers jail and left undisturbed for the remainder of the day.

On August 24 at 10:30 a.m. relator was again taken from the jail. He went with two police officers for an hour's ride. During this trip, also, he was interrogated about the disappearance of Rosemarie Spezzo. Returned to the jail at 11:30 a.m., he was taken to the District Attorney's office in White Plains at 1:25 p.m. There two officers questioned him for about three and a half hours. At 5:40 p.m. the police officers discontinued their interrogation, and the District Attorney questioned him for a half hour. Relator was then taken back to the Yonkers jail and was not further questioned until 9:00 a.m. the following

day. At that time he was again removed from the Yonkers jail and more or less continuously interrogated by the police until shortly after noon, when he agreed to lead them to Miss Spezzo's body.

On that day, August 25, as on the preceding days, a bare outline of relator's activities is not in substantial dispute. Relator rode in a police car with two police officers to New York City and back from 9:00 a.m. until 11:30 a.m. At 11:50 a.m. he was interrogated in the police captain's office at the Yonkers Police Station by the captain and two other officers. At 12:10 p.m. these three police officers left the room, and another detective talked quietly to Eckwerth for about twenty minutes. At the end of this period relator agreed to take the police to Rosemarie's body if they would first allow him to speak to his wife and child. Subsequently, when the police informed him that they were unable to locate Mrs. Eckwerth immediately, he agreed to postpone seeing them and to take the police officers at once to the place where he had left the body. He left the police station about 2:10 p.m. and took the officers to a secluded wooded area on the easterly outskirts of Yonkers, where the decomposed remains of Rosemarie Spezzo were found. The District Attorney and a court reporter promptly arrived at the scene, and from 2:45 to 4:10 p.m. the first of the two questioned confessions was taken. Thereafter relator was taken to the District Attorney's office and from 5:25 to 8:10 p.m. relator gave his second and final confession. Subsequently he was permitted to see his wife, and at about 10:15 p.m. he was arraigned before a magistrate on the charge of murder.

■ In attacking the constitutional validity of his confessions relator relies on his testimony at the trial that he was severely beaten by the three police officers interrogating him on August 25 from 11:50 a.m. to 12:10 p.m., and also that he was verbally abused, slapped, and threatened with beatings on numerous occasions from August 22 until the day he confessed. But all of this testimony was flatly contradicted at the trial by the State's witnesses. The policemen accused severally deny the charges; and the prison doctor—by whom relator denies being examined—testified that he did examine him shortly after the alleged beating on August 25 and that relator showed no bruises or other indications to support his charges. The issue thus turned on the credibility of the witnesses before the jury; and it was properly left to the jury under a reasonable charge. On this review we may not reexamine this disputed testimony. Crooker v. State of California, 357 U.S. 433, 437, note 3, 78 S.Ct. 1287, 2 L.Ed.2d 1448; Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224.

■■ Of course the jury's ultimate finding that the confessions were voluntary does not relieve this court of its obligation to make an independent examination into the constitutional question of voluntariness from the facts and circumstances revealed by the undisputed evidence. Payne v. State of Arkansas, 356 U.S. 560, 562, 78 S.Ct. 844, 2 L.Ed. 2d 975; Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948; Harris v. State of South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815; Turner v. Com. of Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810; Haley v. State of Ohio, supra, 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224; Malinski v. People of State of New York, 324 U.S. 401, 404, 65 S.Ct. 781, 89 L.Ed. 1029. We do not find, however, that the amount of questioning which relator underwent subjected him to coercion of a constitutionally impermissible degree. Continued questioning by itself may be unconstitutionally coercive. Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Watts v. State of Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801; Turner v. Com. of Pennsylvania, supra, 338 U.S. 62, 69 S. Ct. 1352, 93 L.Ed. 1810; Haley v. State of Ohio, supra, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; Ashcraft v. State of Tennessee, 322 U.S. 143, 64 S.Ct. 921,

88 L.Ed. 1192. See also Payne v. State of Arkansas, supra, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975, where defendant's illegal confinement was treated as one factor of coercion. But here, unlike the Payne, Fikes, and Haley cases, relator is a mature adult of normal intelligence and of some experience with the police; and relator's treatment does not reach the severity of that found coercive in the Watts, Ashcraft, and Turner cases.

■ The questioning here was intermittent, and not unduly persistent. The sessions of interrogation were never more than a few hours long; and relator was always given ample rest and food. On August 21 in Portland and on August 23 in Yonkers relator was brought before magistrates. He had on these occasions some notification of his rights, which he did not claim. Nor did he complain of his treatment either on these occasions or on August 25, when, after his confessions, he was arraigned on the murder charge. A confession to be voluntary need not be freely volunteered. Watts v. State of Indiana, supra, 338 U.S. 49, 53, 69 S.Ct. 1347, 93 L.Ed. 1801. And relator's confessions here seem unquestionably the result of his own free choice, rather than the product of sustained pressures by the police. Eckwerth's inner consciousness at having committed a murder—a likely cause of the sudden flight which first drew suspicion upon him—seems also the source of his complete admissions of the crime he had previously repeatedly denied. His own acts uncovered the crime to the police, who had previously known only that the victim was missing.

Accordingly the order of the district court denying the petition for a writ of habeas corpus is affirmed. The stay of execution heretofore granted by this court will terminate fifteen days after the filing of this opinion, when the mandate to the district court issues under our Rule 28(b).