Clarence COLLINS, Appellant,

v.

George J. BETO, Director, Texas Department of Corrections, Appellee.

No. 21739.

United States Court of Appeals
Fifth Circuit.

June 18, 1965.

Rehearing Denied July 21, 1965.

Hutcheson, Circuit Judge, dissented.

William F. Walsh, Houston, Tex., for appellant.

Samuel H. Robertson, Jr., Asst. Dist. Atty., Sam R. Wilson, Asst. Atty. Gen., Houston, Tex., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and FRIENDLY,* Circuit Judges.

TUTTLE, Chief Judge.

Clarence Collins, presently serving a 99-year sentence in a Texas penitentiary based on a conviction of murder with malice aforethought, appeals from the district court's denial of his petition for habeas corpus. The parties stipulated "that the sole question presented * * * is the admissibility, as a matter of law, of the confession introduced against the relator in this cause."

Collins was charged with having murdered Mrs. Wilma Selby in her home on November 16, 1959. Several days after the killing, Mr. Selby admitted to the police that he had for some time been attempting to hire someone to kill his wife. He said he did not know who actually did the killing, but he implicated several persons, including Maggie Morgan, who admitted having taken Mr. Selby's money but denied complicity in the killing.

Collins was a long-time associate of Maggie Morgan and was at her home on December 12, 1959, when Houston police

* Of the Second Circuit, sitting by designation.

officers arrived to question her. Since the police "were talking with everybody that was associated with Maggie Morgan," Collins was placed under arrest. There was no warrant and, admittedly, no probable cause for this arrest.[1] Collins was questioned at Police Headquarters the night of December 12th and again on the morning of December 14th, at which time he executed an affidavit stating that Maggie Morgan had once asked him whether he wanted to kill someone for a thousand dollars, but that, thinking she was joking, he paid no particular attention to her query. He was given a polygraph test around mid-day and was released at 6 P.M., no charges having been preferred against him.

Collins' second encounter with the police resulted in the confession challenged here as inadmissible. On January 19, 1960, E. T. Morgan, a private detective, money-lender, and bondsman, met with representatives of the Houston Police Department, the Harris County Sheriff's office, and the Harris County District Attorney's office. With a view toward claiming the reward offered by a Houston newspaper for information leading to the apprehension of Mrs. Selby's killer, Morgan told the officers that he had information that Collins was the guilty party. He did not elaborate any further.[2]

After the meeting with Morgan, at around 7:30 P.M. on January 19th, Houston police officers arrested Collins at his home on orders from Captain Waycott. When asked at the State trial why no warrant was obtained for this arrest, Captain Waycott testified, "All we were working on was the investigation. We didn't feel justified in charging the man

1. Captain Waycott, head of the Houston Police Department Homicide Division testified as follows:
   "Q. Why didn't you get a warrant for Clarence Collins' arrest?
   "A. We were not justified in getting a warrant for his arrest.
   "Q. You were justified in getting him without a warrant?
   "A. We had some information, and we wanted to talk to him.
   "Q. What?
   "A. We had some information that he had been associated with Maggie Morgan."

2. In the district court, Judge Wallace C. Moore, who was First Assistant District Attorney of Harris County in 1959 and 1960, testified that he was present at the meeting with E. T. Morgan:
   "Q. Did he [Morgan] give you any details as to why he thought the individual that he suspected was the suspect, did he explain the basis for his—
   "A. No, sir."
   He also testified that, even after Collins was arrested and taken to Ranger Headquarters, "Mr. Morgan was not sure that this was the man. I don't know what his source of information was. He left the group * * * to check his information again * * *."
   Captain Waycott of the Houston Police Department was also at the meeting with Morgan:
   "Q. Did he tell you what the information was?
   "A. Other than that he had done the killing.
   "Q. Did he tell you how he knew of this opinion of his that Clarence Collins had done the killing?
   "A. How he knew, whom he got it from?
   "Q. Yes, sir.
   "A. No, sir.
      *     *     *     *     *
   "Q. Did he state in any way how his sources knew that Clarence Collins was, as he put it, the killer of Wilma Selby?
   "A. No, sir, he didn't tell me where he got the information or how he knew, but he said it was right."
   Lloyd Frazier, a member of the Harris County Sheriff's office, also testified about the meeting with Morgan:
   "Q. What information was it that Mr. E. T. Morgan gave you at that meeting, what did he say?
   "A. That he had positive information that a subject by the name of Sack was the triggerman in the Selby murder.
   "Q. And did he advise you of facts which caused you to believe whatever, it was that he believed, or did he just say 'I have positive information'?
   "A. No, sir, we had to take him at face value.
   "Q. Sir?
   "A. We took him at face value for his word."

with an offense of that kind * * * on the basis of the information we had."[3]

After consulting with representatives from the Sheriff's and District Attorney's offices, the police took Collins to Texas Ranger headquarters in Houston. This location was selected because the officers "didn't want anyone to know * * * [they] had the subject at the time." The testimony as to what transpired at Ranger Headquarters on January 19th is in dispute. The district court found that "during this time, Collins was engaged in conversation 'on and off' by several of the officers who were present in the building, but there appears to have been no serious, pressing questioning."

At approximately midnight, Collins was taken by a Sheriff's officer, accompanied by E. T. Morgan, to Humble, Texas, a small community on the outskirts of Houston, about ten or twelve miles from the Ranger Headquarters. While Morgan stayed in the Sheriff's car with Collins, the Sheriff's officer went before a Justice of the Peace in Humble and swore out a criminal complaint charging the crime of vagrancy and naming the accused as "Joe Smith." Upon this complaint, the Justice of the Peace issued a warrant for the arrest of "Joe Smith," on the basis of which Collins was placed in the Humble jail. Police and Sheriff's officers admitted, in both State and Federal courts, that they had no basis whatsoever for charging Collins with vagrancy and that the Sheriff's officer knew that Collins' name was not "Joe Smith."

Collins remained overnight in the Humble jail without any further questioning. On the afternoon of January 20, 1960, the officers who had arrested him at his home the night before picked him up from the Humble jail and returned him, after making a few stops for food and personal business, to the Ranger Headquarters in Houston. Beginning around 7 P.M., Collins was questioned by Captain Waycott for approximately 30 minutes and then by the officers who had arrested him for a little more than an hour. Having recalled that one of these officers had previously helped clear him of some false accusation, Collins stated he would tell this officer "all about it" and made an oral statement concerning the crime. Police and Sheriff's officers were then called in and Collins repeated his statement to them.

Collins was then left alone with Officer Baker of the Houston Police Department. Baker testified at the State trial that he questioned Collins for about 45 minutes without advising him that he need make no statement. Baker then took about two hours to take down Collins' statement in writing. The *written* statement included the formulation of a warning that Collins need make no statement and that a statement, if made, could be used against him. This statement, completed about midnight, recited that Collins had gone to the Selby house the night of the murder with Maggie Morgan and a woman named Johnson. It further stated that Collins remained outside in the car while Maggie Morgan went into the house.

Finding this statement unsatisfactory, the officers expressed to Collins their belief that he had not told the entire truth. At around 1:30 A.M. on January 21st, he was given a lie-detector test, which the district court found to be at his own request. He was given a second lie-detector test at around 2 A.M. Questioning recommenced at around 3:15 A.M. Shortly thereafter, Collins confessed to the crime in the presence of Officer Baker, Captain Waycott, and Chief Frazier. After Collins' oral confession Captain Waycott filed murder charges against him and telephoned a Justice of the Peace in order to obtain an arrest warrant. At the same time, Officer Baker began taking down in writing the second

3. Before the district court, First Assistant District Attorney Moore testified that he did not regard Morgan's information as sufficient to justify the issuance of a warrant. He stated, "I didn't know whether it was good information or bad information."

statement. The three-page statement took almost two and one-half hours to transcribe and was finally signed by Collins at around 7 A.M., January 21st. Collins was then taken to the Houston Police station where a record of his arrest was made. At about 9 A.M., he was taken before a Justice of the Peace and formally charged.

■ Collins objected to the admission into evidence of his January 21st confession on three grounds: (1) that the confession was "involuntary", (2) that the confession was the "fruit" of an unlawful arrest under the Fourth and Fourteenth Amendments, and (3) that the confession was taken when Collins was without counsel in violation of the Sixth and Fourteenth Amendments. I agree with the conclusion and reasoning in Judge Friendly's separate opinion that Collins' confession was "involuntary" as a matter of law. I believe, however, that there are more basic, and less nebulous, grounds which require a reversal in this case and which merit exposition. What is said hereafter, therefore, is my expression alone.

The district court recognized that tangible evidence obtained through unconstitutional searches and seizures is inadmissible in a State court. Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 681.[4] However, the court declined to construe Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441, and Gatlin v. United States, 1963, 117 U.S.App.D.C. 123, 326 F.2d 666, holding that statements made following an unlawful arrest were inadmissible as being based, like Mapp, on the Constitution. The court stated:

> "The Wong Sun and Gatlin cases did indeed hold inadmissible the incriminating statements obtained from defendants while under illegal arrest, but both cases dealt with federal convictions, and both decisions appear to have been largely, if not entirely, govered [sic] by the

federal evidentiary principles which find their genesis in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). * * * [The McNabb] rule has been repeatedly and emphatically characterized as a mere evidentiary rule for the federal courts, drawn under the supervisory powers of the Supreme Court, and of far less than constitutional force. * * *

* * * * * *

> "Thus, assuming the petitioner is correct in alleging that his confession was obtained while he was unlawfully in custody, he has not, without more, established its inadmissibility."

I disagree. Wong Sun's exclusionary rule is equally applicable in both state and federal courts. If any hint of this were needed outside of the language of the Wong Sun opinion itself, the Supreme Court gave such a hint prior to the decision here under review when it vacated the judgment in State v. Traub, 1962, 150 Conn. 169, 187 A.2d 230, and remanded the case "for further consideration in light of Wong Sun * * *." Traub v. Connecticut, 1963, 374 U.S. 493, 83 S.Ct. 1899, 10 L.Ed.2d 1048; cf. Fahy v. State of Connecticut, 1963, 375 U.S. 85, 90–91, 84 S.Ct. 229, 11 L.Ed.2d 171. Also prior to the district court's decision, this court went on record as finding Wong Sun based, not upon the Supreme Court's supervisory power, but upon the Constitution. Rogers v. United States, 5 Cir., 1964, 330 F.2d 535, 541 (dictum). I endorse the position stated there, believing it demanded by the Supreme Court's repeated reference to the Constitution in Wong Sun.

A threshold question for the applicability of the Wong Sun rule in this case is whether there was an unlawful arrest. An arrest is lawful, absent a warrant, only if the arresting officer has probable cause to believe that the suspect committed a crime. Henry v. United States,

---

4. Since Mapp was decided before the State process here was completed, the issue of

the retroactivity of the Mapp rule is not present in this case.

1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134; Brinegar v. United States, 1949, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879. This rule is applicable to arrests by State as well as Federal officers. Ker v. California, 1963, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 10 L.Ed.2d 726. Although probable cause for arrest may be based on credible hearsay, it clearly cannot be based on information or "affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based." United States v. Ventresca, 1965, 380 U.S. 102, 108–109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684. The only information offered as supporting Collins' arrest in this case, E. T. Morgan "tip", clearly does not meet the test,[5] and the State law enforcement officers knew it.[6] Even if Collins was not deprived of his constitutional rights when he was taken into custody at his home on the evening of January 19th, there can be no doubt that he was so deprived when he was locked up in the Humble jail based on a spurious vagrancy warrant in the name of "Joe Smith." Thus, the necessary predicate for the application of the exclusionary rule of Wong Sun is indisputedly present in this case.

It has been stated that "[i]n Wong Sun, the illegal arrest alone made the post-arrest admissions while still in custody poisonous fruit." Gatlin v. United States, 1963, 117 U.S.App.D.C. 123, 326 F.2d 666, 672. This view is buttressed by the Supreme Court's approving citation, 371 U.S. at 486, 83 S.Ct. at 417 n. 12, of Bynum v. United States, 1958, 104 U.S.App.D.C. 368, 262 F.2d

465, which held that "the fact that an illegal arrest enabled the police to take * * * fingerprints while the suspect was illegally detained is in itself and without more a sufficient ground for excluding them [the fingerprints] from evidence." 262 F.2d at 466. See also Nueslien v. District of Columbia, 1940, 73 U.S. App.D.C. 85, 115 F.2d 690, cited in 371 U.S. at 485–486, 83 S.Ct. 407. Whatever standards may be applicable where an arrest is only "technically" illegal, I would hold that the evidence as to the manner in which Collins was taken into and held in custody was clearly sufficient to establish the prima facie inadmissibility of his post-arrest statements. Upon a showing of such an illegal arrest as appeared here, the burden fell upon the prosecution [7] to show by clear and convincing evidence "that the connection between the arrest and the statement had 'become so attenuated as to dissipate the taint' " 371 U.S. at 491, 83 S.Ct. at 419, or that the statement was obtained by means "purged of the primary taint." 371 U.S. at 488, 83 S.Ct. 407.

Far from establishing that Collins' confession was so separated from the arrest as to be unrelated to the "taint" of his unlawful arrest, the testimony of the State's law enforcement officers unequivocally demonstrates precisely the sort of connection between Collins' arrest and confession dealt with in Wong Sun. There the Supreme Court based its application of the exclusionary rule on the need for deterring unlawful police conduct. 371 U.S. at 486, 83 S.Ct. 407. The theory of deterrence operates "only if an excludable piece of evidence is the target of police activity." Comment, 69 Yale L.J. 432, 436 n. 12.[8] It is clear that

---

5. See footnote 2, supra.

6. See footnote 3, supra, and accompanying text.

7. See Maguire, Evidence of Guilt, 221–22 (1959):
   "The prosecution, by its misbehavior, has befouled the case and should have the obligation to launder it; the prosecution knows where and how and when its incriminating evidence was secured."

8. "Exclusion of evidence best deters unlawful arrest when a causal relationship between the evidence excluded and the purpose of the arrest is shown. If law enforcement agents realize that evidence will be unavailable in court, they will presumably refrain from making unlawful arrests *designed to obtain that evidence.*" Id. at 436 (Emphasis supplied.)

the confession obtained on the morning of January 21st was the "target" of Collins' unlawful detention. Collins was kept in custody, not because the police had a legitimate basis for detaining him for as long as they did, but merely because his detention and questioning were aids in their "investigation." [9] Nor can the mere passage of time serve to "dissipate the taint" of an unlawful arrest. If this were so, the police would be free simply to keep a suspect "on ice" for a day or two before beginning an interrogation. This would postpone the tasting of the fruit but would not diminish its temptation.

Even where, as here, there is a connection between the confession and the unlawful arrest, the confession may still be admissible if the State establishes that its officers had "purged the taint" prior to the time the inculpatory statement was given. The best and perhaps the only way to accomplish this would be to afford the suspect an effective opportunity to obtain the assistance of counsel. See Kamisar, Illegal Searches or Seizures and Contemporaneous Incriminating Statements: A Dialogue on a Neglected Area of Criminal Procedure, 1961 U.Ill. L.F. 78, 139. Compare United States v. Burke, D.Mass.1963, 215 F.Supp. 508, 511, aff'd, 1 Cir., 1964, 328 F.2d 399, cert. denied, 379 U.S. 849, 85 S.Ct. 91, 13 L.Ed. 2d 52,[10] where the accused was advised of his right to counsel. No such opportunity was afforded here; indeed there is no evidence at all which contradicts Collins' allegation that he was held incommunicado from the time of his arrest on January 19th until after his confession on January 21st. He was inaccessible to family, friends, and counsel, if he had one.

The taint of Collins' unlawful detention could not have been purged by the fact that he might have been warned, *after he had completed his oral statement* and while Officer Baker was preparing to commit this to writing, that he need make no statement. See Killough v. United States, 1962, 114 U.S.App.D.C. 305, 315 F.2d 241; 74 Harv.L.Rev. 1222–24 (1961). The reaffirmation of Collins' oral statement cannot be considered independent of that statement. There was neither a sufficient lapse of time, cf. United States v. Bayer, 1947, 331 U.S. 532, 541, 67 S.Ct. 1394, 91 L.Ed. 1654, (six months) nor a significant change in circumstances. Cf. United States v. Morin, 3 Cir., 1959, 265 F.2d 241, 245–246 (appointment of counsel). Nor, I believe, would the taint be purged even if we were to hold that the confession was "voluntary." See Wong Sun v. United States, supra, 371 U.S. at 486, 83 S.Ct. at 417 n. 12. The "voluntariness" test for confessions in general has been subjected to sharp criticism. See Kamisar, What Is An "Involuntary" Confession? Some Comments on Inbau and Reid's Criminal Interrogation and Confessions, 70 Rutgers L.Rev. 728 (1963). The test requires a factual inquiry which ordinarily requires the court to weigh the defendant's testimony against that

9. The testimony of Captain Waycott in the State court is revealing:
   "Q. Why was he not released at midnight on the night before, [January 19] instead of being taken to the Humble jail?
   "A. Because we were still working on the case, and our investigation was not completed.
   *    *    *    *    *
   "Q. Why was it that you didn't release him at 8:00 or 9:00 o'clock when you got to Ranger Headquarters on the 20th?
   "A. Because we were still working on the case. Our investigation was not complete.
   "Q. Why was it you didn't release him at midnight on the night of the 20th [after his first inculpatory statement]?
   "A. For the same reason."

10. Even so, this opportunity must be afforded *before* the otherwise tained evidence is obtained. See Judge Aldrich's dissent, 328 F.2d at 403, 404.

of the police.[11] That was true in this case. Such an inquiry would practically eviscerate the prophylactic effect of the exclusionary rule. Moreover, if a mere showing that a confession during a period of unlawful detention was "voluntary" were sufficient to establish its admissibility, Wong Sun would be an empty promise, for the inadmissibility of "involuntary" confessions has long been fully recognized.[12] See Brown v. Mississippi, 1936, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682.

Since the record, without dispute, reveals that Collins' confession was obtained during a period of detention in violation of his constitutional rights and that nothing occurred to dissipate or purge the taint of his illegal arrest, I would hold that the confession may not be used as evidence against him. Had he been effectively afforded the assistance of counsel before making his inculpatory statement, a different result might well be reached. This is so not only on the theory that the intervention of counsel between the arrest and the statement would have "purged the taint" of the arrest, but also because I view the decision in Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 as a proper alternate ground for granting the relief Collins is seeking here.

It is argued here that Escobedo was intended to be limited to its own facts. Those facts were summarized by the Supreme Court as follows:

"We hold * * * that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' * * * and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." 378 U.S. at 490–491, 84 S.Ct. at 1765.

Even if the holding is limited, as the state contends, all the enumerated factors are present in the case at bar, except that there is no showing that Collins ever requested the assistance of counsel.[13] But this omission must be viewed as inconsequential.

It has been suggested that the court in Escobedo treated the request for counsel merely as evidence that the investigation had begun to focus on the defendant. People v. Dorado, Cal., 1964, 40 Cal.Rptr. 264, 394 P.2d 952, 957; People v. Dorado, Cal., 1965, 42 Cal.Rptr. 169, 176, 398 P.2d 361 (on rehearing en banc); Note, The Right to Counsel During Police Interrogation: The Aftermath of Escobedo, 53 Calif.L.Rev. 337, 361. This view finds support in the following passage from the opinion:

"The interrogation here was conducted before petitioner was formal-

---

11. See Culombe v. Connecticut, 1961, 367 U.S. 568, 574, 81 S.Ct. 1860, 1863, 6 L. Ed.2d 1037:

"Certainly, if through excess of zeal or aggressive impatience or flaring up of temper in the face of obstinent silence a prisoner is abused, he is faced with the task of overcoming by his lone testimony, solemn official denials. The prisoner knows this—knows that no friendly or disinterested witness is present—and the knowledge may itself induce fear."

12. I disagree with any contrary implication that might be found in the dictum in Rogers v. United States, supra, 330 F.2d at 141–142.

13. Considering the circumstances discussed above, it cannot be said that any warning Collins might have received immediately prior to the rendition of his statement into writing was efficacious.

ly indicted. Within the context of this case, that fact should make no difference. When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of 'an unsolved crime.' * * * Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so." 378 U.S. at 485, 84 S.Ct. at 1762.

It would be disingenous, however, to suggest that there is no unclarity in the opinion on this point.

Be this as it may, "it is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request." Carnley v. Cochran, 1962, 369 U.S. 506, 513, 82 S.Ct. 884, 889, 8 L.Ed. 2d 70. See also McNeal v. Culver, 1961, 365 U.S. 109, 111, 81 S.Ct. 413, 5 L.Ed. 2d 445 n. 1; Uveges v. Commonwealth of Pennsylvania, 1948, 335 U.S. 437, 441, 69 S.Ct. 184, 93 L.Ed. 127. This principle is fully applicable to the right to counsel during police interrogation. Lee v. United States, 5 Cir., 1963, 322 F.2d 770, 777.

In People v. Dorado, Cal., 1964, 40 Cal. Rptr. 264, 268, 394 P.2d 952, 956–957, the Supreme Court of California well expressed the rationale of the rule which makes a request for counsel immaterial:

> "We find no strength in an artificial requirement that a defendant must specifically request counsel; the test must be a substantive one: whether or not the point of necessary protection for guidance of counsel has been reached.
>
> "The defendant who does not realize his rights under the law and who therefore does not request coun-

sel is the very defendant who most needs counsel. We should not penalize the defendant who, not understanding his legal rights, does not make the formal request and by such failure demonstrates his helplessness. * * * To require the formal request for counsel for the application of the rule would be to favor the defendant whose sophistication or status had fortuitously prompted him to make the request."

On rehearing en banc the court reiterated this position. People v. Dorado, 1965, 42 Cal.Rptr. 169, 175–178, 398 P.2d 361. Accord: Wright v. Dickson, 9 Cir., 1964, 336 F.2d 878, 882; State v. Hall, Idaho, 1964, 397 P.2d 261, 268–269. The Third Circuit Court of Appeals has recently taken the same view. United States ex rel. Russo v. New Jersey, 351 F.2d 429.

There can be no doubt that the investigation had focused on Collins prior to the time he gave his confession. "The guiding hand of counsel," Powell v. State of Alabama, 1932, 287 U.S. 45, 69, 53 S. Ct. 55, 77 L.Ed. 158, was required but was withheld by public officials more concerned with "sewing up" a sensitive case than with safeguarding the rights of the individual in their custody. A confession obtained under these circumstances is inadmissible against the party making it.[14]

Collins' conviction was affirmed prior to the decision in Escobedo. Collins v. State, 1961, 171 Tex.Cr.R. 585, 352 S.W. 2d 841, cert. denied, 1962, 369 U.S. 881, 82 S.Ct. 1152, 8 L.Ed.2d 283. But this would not affect my decision. The question of the retroactivity of the Escobedo rule is settled in this Circuit. See Pate v. Holman, 5 Cir., 1965, 341 F.2d 764, 775–776 (right to counsel on appeal); Williams v. State of Alabama, 5 Cir., 1965, 341 F.2d 777, 781 (right to counsel at arraignment). The rationale of those

---

14. Lest I be accused of showing an inconsistent regard for the usefulness of the Wong Sun rule, see text accompanying note 12, supra, I point out that, although where an investigtaion has begun to focus on a particular suspect, Escobedo probably makes Wong Sun redundant, there is a considerable area prior to such focusing in which Wong Sun provides valuable protection. See Douglas, Vagrancy and Arrest on Suspicion, 70 Yale L.J. 1 (1960), Kamisar, Book Review, 76 Harv.L.Rev. 1502 (1963).

cases is applicable here. In this Circuit, the basis for retrospective application of an exclusionary rule has been a finding that the object of the rule is "to provide fairness in the trial itself," Pate v. Holman, supra, 341 F.2d at 776, or "to provide fairness in procedure." United States ex rel. Linkletter v. Walker, 5 Cir., 1963, 323 F.2d 11, 19. The Escobedo rule fits into this categorization.

In Escobedo the Court noted that the time when police interrogation began to focus upon the accused "was the 'stage when legal aid and advice' were most critical to petitioner. * * * It was a stage surely as critical as the arraignment in Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114, and the preliminary hearing in White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193. What happened at this interrogation could certainly 'affect the whole trial', Hamilton v. State of Alabama, supra, 368 U.S. at 54, 82 S.Ct. at 159 [157,] since rights 'may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives the right for strategic purposes.' Ibid." 378 U.S. at 486, 84 S.Ct. at 1762.[15] However fallible one's perception of the purpose of an exclusionary rule may be, if the purpose of Gideon v. Wainwright, 1963, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 1799,[16] Hamilton v. State of Alabama, 1961, 368 U.S. 52, 82 S.Ct. 157,[17] and Douglas v. People of State of California, 1963, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811,[18] supports retroactive application, the purpose of Escobedo must do the same.

The rebuke that "[t]he criminal is to go free because the constable has blun-

dered" People v. Defore, 1926, 242 N.Y. 13, 21, 150 N.E. 585, 587 (Cardozo, J.), cert. denied, 270 U.S. 657, 46 S.Ct. 353, 70 L.Ed. 784, was long the shibboleth of the opponents of the exclusionary rule in a debate which has now been authoritatively resolved. It is indisputably a policy of our society that criminals be speedily apprehended and justly convicted. But in pursuing this aim we must sedulously avoid prejudicing other, and higher, goals. One such goal is certainly a cutting down of the incidence of unlawful conduct against private persons by public officials.

> "In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means— to declare that the government may commit crimes in order to secure the conviction of a private criminal— would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." Olmstead v. United States, 1928, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 66 A.L.R. 376 (Brandeis, J., dissenting.)

Public brutality breeds private brutality, and private brutality breeds public brutality; regardless of which is the chicken

---

15. See aso 378 U.S. at 487, 1763.
   "The rule sought by the State here, however, would make the trial no more than an appeal from the interrogation; and the 'right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination.' * * * 'One can imagine a cynical prosecutor saying: "Let them have the most illustrious counsel, now. They can't escape the

noose. There is nothing that counsel can do for them at the trial." ' "

16. Held retroactive in United States ex rel. Durocher v. LaValle, 2 Cir., 1964, 330 F. 2d 303, cert. denied, 377 U.S. 998, 84 S. Ct. 1921, 12 L.Ed.2d 1048; Williams v. State of Alabama, supra.

17. Held retroactive in Williams v. State of Alabama, supra.

18. Held retroactive in Pate v. Holman, supra.

and which the egg, the circle must be broken. The public sector cannot wait for the private sector to take the initiative. So far as the obligation falls to the lot of the federal courts to play a part they must not retreat from the duty of using the only means at their command to bring to an end unlawful arrests and other violations of fundamental rights. This means is to set aside convictions, whether they be by state or federal courts, that are based on such denials on the part of public officials of the constitutional rights of the individual.[19]

In this case, the State officers acted without regard for the law or for the rights of their prisoner. Consequently, his present custody is illegal, and relief by habeas corpus should have been granted.

The judgment of the district court is reversed and the case is remanded to the trial court for the entry of an appropriate order directing that appellant be released from custody unless, within a reasonable time, the State of Texas affords him a new trial in which inculpatory statements made by Collins on January 20 and 21, 1960 shall not be received.

FRIENDLY, Circuit Judge (concurring):

■ Since I am persuaded that Collins' confession was not voluntary, I join in the disposition directed in Chief Judge Tuttle's opinion. Taking that view, I prefer not to decide what to me are more difficult questions whether Collins is also entitled to prevail because of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), or Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

The standard as to review of a lower court judgment varies with the type of issue, and we are instructed that the voluntariness of a confession involves several inquiries. Culombe v. Connecticut, 367 U.S. 568, 603–606, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). The first

step is to establish "the crude historical facts * * * surrounding the confession," 367 U.S. at 603, 81 S.Ct. at 1879. As to these the district judge's findings control "unless clearly erroneous," F.R. Civ.P. 52(a). In the light of the lower court's contrary finding, made after full hearing, we are thus precluded from giving any consideration to Collins' claim that the police beat him to make him confess. After all the circumstances are established, the court must then decide what impact they had on the mind and will of the individual defendant—perhaps also a question of "fact" but one of a quite different sort, particularly when, as here, expert psychological testimony in the record somewhat diminishes the advantage of the district judge from seeing the prisoner in the courtroom. Finally, the court must decide the "inextricably interwoven" question of "the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law * * *." 367 U.S. at 603, 81 S.Ct. at 1879 specifically, whether the totality of the "crude historical" and "psychological" facts warrants the legal label "coercion." These two later decisions depend very little on the credibility of witnesses, which usually is critical for "crude historical facts," and precedents confirm that an appellate court has considerable responsibility to form its own judgment whether a record in a particular case suffices to bespeak coercion. See Culombe v. Connecticut, supra, 367 U.S. at 603–605, 81 S.Ct. 1860; Haynes v. State of Washington, 373 U.S. 503, 515–517, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); United States ex rel. Eckwerth v. Denno, 261 F.2d 511, 513 (2 Cir. 1958), cert. denied, 358 U.S. 945, 79 S.Ct. 355, 3 L.Ed.2d 353 (1959).

Chief Judge Tuttle has clearly set out the facts based upon the concessions of both sides and the findings of the district judge. If we disregard the claimed beating as we must, no single circumstance standing alone would characterize the

---

19. The disastrous effects sometimes predicted for such actions have not materialized. See People v. Dorado, 1965, 42 Cal.Rptr. 169, 180, 398 P.2d 361.

statements as involuntary; but when all the elements are taken together, it is not possible for me to feel that Collins' confessions were "the expression of free choice," Watts v. State of Indiana, 338 U.S. 49, 53, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949).

The first step the police took when they picked Collins up was to attempt to isolate him. Instead of taking him to the police station, they drove him ten miles across town to a Ranger headquarters, so that there would be no "interference" with the questioning. Around midnight, they transported him another ten or twelve miles to a jail in a small community on the outskirts of the city, where he was deliberately lodged under a false name. Picked up the next afternoon, Collins rode around with police officers for two and a half hours and arrived back at Ranger headquarters at 5 o'clock for the evening's interrogation. Carried to an extreme, the deliberate shuffling of a prisoner from one jail to another outside his community has itself been deemed enough to invalidate a confession. Ward v. State of Texas, 316 U.S. 547, 555, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942). This unwarranted isolation of Collins was compounded, for during the 36-hour period ending in his second confession he saw no relatives, no friends, and no lawyer. Indeed, since he had not been booked at the city police station nor taken before a judicial officer, he might quite reasonably have believed that no one would be able to locate him until the police chose to make his arrest public; and it is not hard to realize the corrosive effect of such fears upon the will of one entirely within the police's power. Compare Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336 (1963). At no stage was Collins ever told that he had a right to consult with a lawyer, or even with his family, before making any statement. Such advice offers a prisoner a link with the outside world and a chance to seek guidance other than from those who want him to confess; however Escobedo may ultimately be read, the presence or absence of such a warning weighs in measuring the voluntariness of a confession.

Collins' own mental and emotional makeup indicates that his capacity to resist pressure was strikingly low. The district judge summarized by saying, "A psychiatrist and a psychologist, testifying in Collins' behalf, stated that he was of low intelligence, although not mentally defective, and that they felt he had a low ability to withstand stress." Their testimony reveals that Collins' I.Q. was in the lowest ten percent of the population; that his judgment was "extremely poor"; that he would "respond abnormally in an attempt to avoid * * * what to him would represent stress"; that his low I.Q. made him a "greater target for suggestibility"; and that with respect to resisting pressure, Collins' character was "more like that found in children between the ages of three and six." That these special susceptibilities and Collins' meagre education must be given due weight is clear from Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), and Spano v. People of State of New York, 360 U.S. 315, 322, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959).

The circumstances of the confession itself are also revealing. The questioning took place not during normal hours but late at night after Collins had been up during the day. See Spano v. People of State of New York, supra, 360 U.S. at 322, 79 S.Ct. 1202. He was questioned by changing teams of officers, who presumably had an opportunity to refresh themselves which he lacked. After he gave his midnight confession, which placed him near the crime but denied participation, he discovered that the police were not prepared either to release him or to hold him merely to check out his story, but renewed their questioning at 3:00 A.M. after two lie detector tests. Collins could well have believed there would be no end until he told the police what they wanted to hear. Finally, while early unequivocal advice that no statement was required might have served to alert or reassure Collins as to the choice before him, the warning that he received was

quite inadequate to that end. At best he was twice told that he need not incriminate himself, in each case *after* he had made the oral confession and before he began to reiterate it for a formal transcription. See Turner v. Commonwealth of Pennsylvania, 338 U.S. 62, 64, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949).

A concluding word is called for regarding the admitted, deliberate violations of law by the police. The 36-hour detention of Collins on the uncorroborated and conclusory charge of a private bounty hunter was a gross violation of the Fourth Amendment. The police swore to a false charge to obtain a warrant under a false name, failed to take Collins before a magistrate as Texas requires after arrests without warrants, and avoided having a magistrate inform Collins of his right to counsel and right not to incriminate himself. See Vernon's Ann.Texas Code Crim.Proc. arts. 215, 217, 245, 247 (1948). The law relating to arrest and detention does not always provide bright lines, and minor errors by the police are hardly to be avoided. But when the police operate in calculated and substantial disregard of the applicable rules, they cannot expect the benefit of any doubts as to undue pressure in a truly close case.

Since in my opinion this ground, established as far back as Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed.2d 682 (1936), requires us to reverse the judgment, I prefer not to attempt resolution of Collins' claims in regard to Wong Sun and Escobedo. In view of Chief Judge Tuttle's persuasive exegesis of these cases, it seems desirable that I pinpoint my areas of doubt.

Wong Sun held that statements which were the fruit of a seizure violating the Fourth Amendment stood no differently than its tangible results, 371 U.S. at 484–487, 83 S.Ct. 407. It is true, as the state emphasizes, that Wong Sun was a federal trial and that the Court spoke "in terms of deterring lawless conduct by federal officers" and "of closing the doors of the federal courts to any use of evidence unconstitutionally obtained," 371 U.S. at 486, 83 S.Ct. at 416. But I perceive no basis for supposing that, having equated verbal with real evidence obtained in violation of the Fourth Amendment with respect to exclusion in federal trials, see Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961), the Court that had decided Mapp v. Ohio, 367 U.S. 43, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), only two years earlier would distinguish the two sorts of evidence with respect to the necessity for exclusion in state trials. See Rogers v. United States, 330 F.2d 535, 541 (5 Cir.), cert. denied, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186 (1964). It is also true that in Wong Sun there had been both an unlawful arrest and an unlawful search, whereas here there was only the former. But that also would seem an unlikely basis for distinction. The Fourth Amendment protects against improper seizure of the person as fully as against unreasonable breaking into the close, see Albrecht v. United States, 273 U.S. 1, 5, 47 S.Ct. 250, 71 L.Ed. 505 (1927); United States ex rel. Potts v. Rabb, 141 F.2d 45 (3 Cir.), cert. denied, 322 U.S. 727, 64 S.Ct. 943, 88 L.Ed. 1563 (1944), and nothing in the Supreme Court's language would warrant a view that the Fourteenth Amendment "absorbs" the Fourth less in one respect than in the other, see Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); compare Cohen v. Norris, 300 F.2d 24, 28 n. 3 (9 Cir. 1962).

▪ I thus follow Chief Judge Tuttle on the general proposition that Wong Sun prohibits the introduction in a state criminal trial of a confession that is the result of an arrest violating the Fourth Amendment, just as Mapp prohibits the reception of an object obtained through an unconstitutional search.[1] Where the

---

1. I here assume, without deciding, that since Collins' direct appeal was still pending when Mapp was decided, Wong Sun, which was a corollary of Mapp, would be applicable although it was decided after Collins' appeal had been terminated by the denial of certiorari, 369 U.S. 881, 82 S.Ct. 1152, 8 L.Ed.2d 283 (1962). Cf. Linkletter v. Walker, 85 S.Ct. 1731 (1965).

problems become different is the less clear causal relation between the unconstitutional act and the "fruit." When the police, by a search violating the Fourth Amendment, seize contraband or overhear a conversation disclosing the location of stolen goods, the connection between the unconstitutional intrusion and the booty offered at trial is so automatic and inevitable that the latter is readily seen as the "fruit" of the unconstitutional act. But when the object improperly seized is a person and the alleged "fruit" is a statement by him, there intervenes the individual's own decision to speak. In Wong Sun itself the causal problems were at the temporal extremes. Toy's statement, which the Court required to be excluded along with the narcotics to which it led, came directly after "[s]ix or seven officers had broken the door and followed on Toy's heels into the bedroom where his wife and child were sleeping" and "[h]e had been almost immediately handcuffed and arrested." 371 U.S. at 486, 83 S.Ct. at 416. By contrast, Wong Sun's statement, held to have been properly admitted despite his unlawful arrest, was made after he "had been released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later to make the statement * * *." 371 U.S. at 491, 83 S.Ct. at 419.

If the objective of obtaining maximum deterrence of arrests by state officers in violation of the Fourth Amendment overrode all other considerations, a narrow test of what breaks the causal chain would be appropriate in every case. But the few courts that have yet had to face the problem have shown reluctance to press Wong Sun so far, placing stress upon the Court's statement, "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." 371 U.S. at 487–488, 83 S.Ct. at 417. Thus, another panel in this circuit has shrunk from concluding that a possible error by the police in thinking an arrest to be legal must require exclusion of a confession made some hours later in a wholly voluntary man-

ner—the court saying, "At first blush * * * [Wong Sun] would appear to require only a passing of sufficient time between the arrest and the statement for the defendant to clear and arrange his mind." Rogers v. United States, supra, 330 F.2d at 541–542. In State v. Traub, 150 Conn. 169, 187 A.2d 230 (1962), vacated and remanded "for further consideration in light of Wong Sun * * *," 374 U.S. 493, 83 S.Ct. 1899, 10 L.Ed.2d 1048 (1963), the Connecticut Supreme Court adhered to its decision admitting the confession, 151 Conn. 246, 196 A.2d 755 (1963), although Traub had no attorney and claimed he had not been warned that he was entitled to remain silent and that anything he said could be used against him, 150 Conn. at 183–187, 187 A.2d at 237–238; and the Supreme Court denied certiorari, 377 U.S. 960, 84 S.Ct. 1637, 12 L.Ed.2d 503 (1964). See also Prescoe v. State, 231 Md. 486, 191 A.2d 226 (1963); State v. Jackson, 43 N.J. 148, 203 A.2d 1 (1964).

Doubtless this judicial reluctance to press Wong Sun to its possible logical limits reflects a realization that interests other than maximum deterrence of unconstitutional arrests are at stake. Also the absence of probable cause or failure to comply with prescribed methods of search or arrest generally has nothing more than a "but-for" causal relation to a subsequent confession, and sometimes not even that. A good deal might be said for a limiting principle based on the wantonness of the arrest, as one passage in Chief Judge Tuttle's opinion may intimate. Compare United States v. Kyle, 297 F.2d 507 (2 Cir. 1961). On this view, a flagrantly unlawful violation by the police would require depriving them of every foreseeable benefit that might spur further adventures of the same kind, certainly suppression of all evidence acquired, including confessions given prior to release or in the absence of a lawyer. On the other hand, those errors of judgment inevitable when the Fourth Amendment is being interpreted "on the run" would not disqualify the evidence, on the theory that the added margin of

deterrence and increased security is not worth the added price. Deciding what is flagrant is no harder than appraising probable cause. If I were sure that some such limiting principle was available, I would be less hesitant in joining Chief Judge Tuttle as to Wong Sun, since the police conduct here was as wanton as could be. But as matters stand, I think it undesirable for an inferior court to attempt to predict what terminal, if any, the Supreme Court will put on Wong Sun until it is seized of a case where that task cannot be shirked.

Before leaving this phase of the case, I should make clear that I am not prepared to hold the initial encounter between the police and Collins on the evening of January 19 to have been an illegal arrest. Although Special Investigator Williams, answering a rather leading question by Collins' counsel, did characterize the episode as such, Detective Ray testified that he didn't arrest Collins, that Collins "agreed to go along and go with us," and that Williams had simply told Collins "that Captain Waycott wanted to see him." There is no evidence that force was used or threatened, though Collins may have thought it would be if he did not comply. The issue whether the police, though lacking enough evidence to justify arrest and incarceration, may not request or even demand that a person suspected of serious crime accompany them to a suitable place of interview for a reasonable period of investigation is so important and the proper answer so doubtful, see, e. g., Watts v. State of Indiana, 338 U.S. 49, 58, 61–62, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (concurring and dissenting opinion of Mr. Justice Jackson); Culombe v. Connecticut, supra, 367 U.S. at 576–581, 81 S.Ct. 1860 (opinion of Mr. Justice Frankfurter); United States ex rel. Corbo v. La Vallee, 270 F.2d 513, 518 (2 Cir. 1959), cert. denied, 361 U.S. 950, 80 S.Ct. 403, 4 L.Ed.2d 382 (1960); United States v. Vita, 294 F.2d 524, 528–530 (2 Cir. 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); United States v. Middleton, 344 F.2d 78 (2 Cir. 1965); United States v. Bonanno, 180 F. Supp. 71 (S.D.N.Y.), rev'd on other grounds, 285 F.2d 408 (2 Cir. 1960); LaFave, Arrest, 300–18, 343–53 (1965), that resolution of that issue also should await a case where the task cannot be avoided.

There has been sharp difference of opinion, see United States ex rel. Russo v. New Jersey, —— F.2d —— (3 Cir. 1965) and cases there cited, on the highly important question whether Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), is to be extended beyond what the Court characterized as "the critical question" in that case, 378 U.S. 479, 84 S.Ct. 1758, and, if so, how far. The testing point is whether the phrase in the holding, 378 U.S. at 490–491, 84 S.Ct. at 1765, "the suspect has requested and been denied an opportunity to consult with his lawyer," was intended to set limits on the decision or was merely an accurate description of the facts. A plausible argument can indeed be assembled for the view that Escobedo will not be limited to factual situations like that there presented. The decision, it is said, obliterates the significance of the beginning of judicial proceedings as triggering the right to counsel; the Court considered it enough that Escobedo "had become the accused" in the eyes of the police. The next proposition is that once that stage has been reached, it can make no difference whether the prospective defendant has sought counsel or not; as to this, reliance is placed on the statement that "the right to be furnished counsel does not depend on a request." Carnley v. Cochran, 369 U.S. 506, 513, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962). If the state has not taken the initiative and furnished counsel at this stage, the argument runs, it must at least advise the accused in such a way that he will clearly understand that he has a right to consult with an attorney before responding to interrogation and that he need not answer at all unless he freely chooses. For only if the suspect makes a "considered choice," Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), to

forego the aid to which, *ex hypothesi,* he is then and there entitled does the Sixth Amendment permit his statements to be used against him. Finally, depending on the rationale thought to underlie an expanded Escobedo doctrine, arguments of some force can be advanced for applying it retroactively. But, as against this chain of quotations from cases presenting quite different problems, there are the many limiting phrases presumably placed in the Escobedo opinion for some purpose—not only the characterizations of the question and of the holding already mentioned, but further language stressing the frustrated attempts of client and attorney to communicate, 378 U.S. at 481–482, 485, 488, 84 S.Ct. 1758, and the reliance on People v. Donovan, 13 N.Y.2d 148, 151, 243 N.Y.S.2d 841, 843, 193 N.E.2d 628 (1963), 378 U.S. 486–487, 84 S.Ct. 1758. Cases like Carnley and Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), concerned the right to counsel at trial, where pitting a layman against a trained prosecutor creates a serious risk that an innocent man will go to jail. The police station confession—itself desirable so far as truly voluntary—presents a very different problem not only in its legal history but in the practical considerations involved. Strong arguments can be mustered for hedging confessions with further safeguards, but we must beware of treating the "right to counsel," "waiver," or any other concept of law as a Platonic reality without considering the context at hand. Since the expansive reading of Escobedo sometimes proposed would take the Court rather far from the historic purpose of the Sixth Amendment, as explained in Powell v. State of Alabama, 287 U.S. 45, 60–65, 68–73, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and Bute v. People of State of Illinois, 333 U.S. 640, 660–663, 68 S.Ct. 763, 92 L.Ed. 986 (1948), would invalidate numerous state and federal convictions if retroactively applied, and might drastically affect the necessary investigation of crime, I do not wish to essay resolution of these grave problems, even on the tentative basis on which a Court of Appeals necessarily acts on a question of this sort, when, in my view, the relator is entitled to prevail on another ground. Compare Edwards v. Holman, 342 F.2d 679 (5 Cir. 1965).

For the reason first stated I join in reversal of the judgment.

HUTCHESON, Circuit Judge (dissenting):

Of the clear and firm view that the district judge was right in denying the writ of habeas corpus sought in this case for the reasons stated by him in his opinion,[1] I take my stand with him. I am, therefore, unable to agree with the contrary opinion of the majority, that the district judge was wrong and that his judgment must be reversed.

I respectfully dissent.

---

**1.** *Collins v. Beto, Director, D.C.,* 241 F.Supp. 170.